IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL PETERSON, | ) | CASE NO. 1:14-CV-00555 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Paul N. Peterson ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying his application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423. This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

### I.   PROCEDURAL HISTORY

On October 10, 2010, Plaintiff filed his application for POD and DIB, alleging a disability onset date of December 2, 2008. (Transcript ("Tr.") 10.) Plaintiff's claim was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*) On September 7, 2012, an ALJ held Plaintiff's hearing. (*Id.*) Plaintiff participated in the hearing, was represented by counsel, and testified. (*Id.*) A vocational expert ("VE") also participated and testified. (*Id.*) On November 8, 2012, the ALJ found Plaintiff not disabled. (Tr. 7.) On January 24, 2014, the

Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1.)

On March 13, 2014, Plaintiff filed his complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 11, 12.)

Plaintiff asserts the following assignment of error: The ALJ erred in evaluating the opinions of Plaintiff's treating physicians.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was born in November 1971 and was 37-years-old on the alleged disability onset date. (Tr. 18.) He had at least a high school education and was able to communicate in English. (*Id.*) He had past relevant work as a project engineer and an attorney. (*Id.*)

### B. Medical Evidence

#### 1. Medical Reports

In April 2009, Plaintiff told Alan S. Castro, M.D., that his business partner found out that he had used some of their common funds to pay his personal bills. (Tr. 259.) Plaintiff indicated that he had every intention of returning the funds and was under the impression that borrowing the funds was okay. (*Id.*) The record indicates that Plaintiff was incarcerated from November 22, 2010, to December 22, 2010, for theft. (Tr. 15, 41.)

Plaintiff began treating with psychologist Jane M. Hellwig, Ph.D., in March 2006. (Tr. 237.) Dr. Hellwig noted that Plaintiff had a "more stable mood" on June 3, 2010. (Tr. 276.) Plaintiff reported good sleep on June 17, 2010, and his prognosis was reported as

fair.  (*Id.*)  In October 2010, Plaintiff was tired and easily irritated, reporting situational stress involving his family.  (Tr. 274.)  Plaintiff also reported tiredness while dealing with "court issues."  (*Id.*)  Prior to Plaintiff's incarceration for theft, Dr. Hellwig wrote a letter opining that incarceration would not be beneficial to Plaintiff, as "[h]e is not a threat to anyone at this time and has learned from his mistake."  (Tr. 292.)  In her letter, Dr. Hellwig described Plaintiff as "the mediator for conflicts within his family of origin and a dependable, caring and reliable spouse for his wife."  (Tr. 292.)

Plaintiff reported to Dr. Castro in June 2010 with reports of recurrent depression.  (Tr. 254.)  Plaintiff stated that he had been hyperactive for three weeks, but after a medication reduction, he felt "much more settled."  (*Id.*)  Plaintiff noted that he "has been dealing with things ok" and had been able to fulfill tasks, remained future-oriented, and enjoyed activities.  (*Id.*)  Plaintiff reported that he was busy assisting his sister with his divorce, planned to spend "close to 2 weeks in Las Vegas playing poker," and "look[ed] forward to teaching Vacation Bible School."  (*Id.*)  Plaintiff had a normal appearance and exhibited a good level of engagement, a full mood range, and normal thought content.  (*Id.*)  He was oriented to place, person, and time with fair/good memory and concentration, and his speech was normal.  (*Id.*)  He had no suicidal or homicidal ideation.  (*Id.*)  Dr. Castro diagnosed bipolar vs. cyclothymia, noting that he was "[more] concerned about existing bipolarity, with an apparent medication induced hypomanic symptoms."  (*Id.*)  Plaintiff had a Global Assessment of Functioning (GAF) score of 68.[1]  (*Id.*)

---

[1] The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association.  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social,

In September 2010, Dr. Castro noted that Plaintiff was optimistic, had other opportunities to work, and had no problems with medications. (Tr. 253.) Plaintiff reported that "overall he has been doing okay but obviously is under much stress." (*Id.*) He exhibited a good level of engagement; normal thought content, thought process, cognition, and speech; no suicidal or homicidal ideations; and fair insight and judgment. (*Id.*)

In January 2011, Dr. Castro noted that Plaintiff seemed more optimistic and denied hopelessness or helplessness. (Tr. 235.) He exhibited a fair level of engagement, normal thought process and content, and normal speech. (Tr. 236.) His mood was "up and down." (*Id.*) Plaintiff reported that he was doing some consulting work for his sister and would soon become an employee, working about four hours a day. (Tr. 235.) Dr. Castro assessed a GAF score of 58.[2] (*Id.*)

On January 6, 2011, Dr. Castro submitted an opinion regarding Plaintiff's mental condition. (Tr. 299-301.) Dr. Castro opined that Plaintiff may be most productive when allowed to complete tasks at his own pace, and that he might have difficulty sustaining attention to tasks for more than four hours at a time. (Tr. 301.) Due to problems with interpersonal skills, Dr. Castro believed Plaintiff it would probably be best if Plaintiff worked alone. (*Id.*)

On January 8, 2011, Dr. Hellwig completed a report for the Bureau of Disability Determination. (Tr. 271-273.) Dr. Hellwig reported that she had been treating Plaintiff from March 9, 2006, through November 1, 2010. (Tr. 271.) She noted that Plaintiff's mood

---

occupational, or school functioning.

[2]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

4

varied with depression and that his judgment and concentration were diminished.  (Tr. 272.)  Plaintiff had poor execution of financial tasks and difficulty with follow-through when depressed/distracted.  (*Id.*)  Dr. Hellwig noted that Plaintiff's episodes of depression were unpredictable and varied in severity, although he was never totally incapacitated.  (*Id.*)  She further noted that Plaintiff did well with routine stressors and that he was compliant with medications and appointments.  (Tr. 273.)

In March 2011, Dr. Castro noted that Plaintiff was "[e]mbroiled in a number of legal battles" and was "trying to be busy" at home.  (Tr. 219.)  Plaintiff noted that he was experiencing fewer mood swings and that when they occurred, they were not as severe.  (*Id.*)  He stated that he was trying to be a role model to a friend that he had met in jail.  (*Id.*)  On examination, Plaintiff had a fair level of engagement, normal thought content, normal thought process, intact cognition, normal speech, and fair insight and judgment with no suicidal or homicidal ideation.  (Tr. 219-220.)  Dr. Castro diagnosed bipolar disorder and assigned a GAF score of 59, indicating moderate symptoms.  (Tr. 220.)

In April 2011, Dr. Castro opined that due to mood swings, Plaintiff's attention to tasks and productivity were unpredictable, and that Plaintiff would have a hard time dealing with others.  (Tr. 305.)  Dr. Castro's May 2011 treatment notes state that Plaintiff tolerated recent changes in medication, and that "[w]ith the increase, [Plaintiff] feels that he continues to be able to get even more things accomplished."  (Tr. 232.)  On May 20, 2011, Dr. Castro wrote a letter supporting Plaintiff's fitness to practice law, stating: "[Plaintiff] has displayed compliance both with treatment and follow up, and I believe is invested in getting better.  With this motivation and support from his family, I believe that his prognosis is good.  If we are successful in managing his moods, I find no reason why he would not be

able to continue to work responsibly and competently in his field." (Tr. 224.)

On August 12, 2012, Dr. Hellwig completed a psychological questionnaire regarding Plaintiff's condition. (Tr. 237-238.) She reported Plaintiff's diagnoses as bipolar disorder and attention deficit hyperactivity disorder (ADHD), combined type. (Tr. 237.) Dr. Hellwig noted that Plaintiff had difficulty sleeping, communicating, making decisions, following-through, and maintaining attention and concentration. (*Id.*) She also noted that Plaintiff had mood swings. (*Id.*) Dr. Hellwig opined that Plaintiff's ability to sustain an 8-hour workday, 5 days per week was "fine," as he had ben working full time since March 2012. (*Id.*) Dr. Hellwig reported that Plaintiff had experienced symptoms severe enough to interfere with concentration and attention from October 2010 to January 2012, and that he would not have been a reliable employee during that period. (Tr. 238.) Dr. Hellwig noted that Plaintiff's ability to get along with co-workers, supervisors, and the general public was "[g]reat when his medications are working well." (*Id.*) She concluded that Plaintiff currently had good capabilities for work. (Tr. 237-238.)

  **2.**  **Agency Reports**

On January 27, 2011, state agency consultant Vicki Warren, Ph.D., reviewed Plaintiff's file and found evidence of an organic disorder and affective disorder. (Tr. 63.) Dr. Warren opined that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining concentration, persistence, or pace; and moderate difficulties in maintaining social functioning. (Tr. 63.) She further opined that Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting and that such changes should be infrequent and easily explained. (Tr. 66.) Dr. Warren concluded that Plaintiff had severe psychological impairments which limited his ability to perform some

6

type of work-related activity, but that he was still capable of performing tasks which did not require him to follow complex instructions, make frequent adjustments to changes in routine, or have frequent interactions with others.  (Tr. 67.)

In April 2011, state agency psychologist Jennifer Swain, Psy.D., opined that Plaintiff could perform work that did not require rapid pace or quotas and involved only superficial interactions with others and infrequent and easily explained changes.  (Tr. 77.)

**C.    Hearing Testimony**

    **1.    Plaintiff's Hearing Testimony**

Plaintiff testified that he had a degree in chemical engineering and a law degree. (Tr. 31.)  As a chemical engineer, he worked in product design and management.  (*Id.*)  As an attorney, he did intellectual property work.  (*Id.*)  Plaintiff testified that he had mental issues which prevented him from working from October 2010 to February 1, 2012.  (Tr. 33.)  Those problems included depression and anxiety.  (Tr. 33-34.)  Plaintiff stated that he struggled with different medications, racing thoughts, depression, and lack of motivation. (Tr. 33.)  He had difficulty motivating himself to complete simple tasks and did not have the motivation to care for his personal hygiene.  (Tr. 40.)  He was in charge of managing his family's finances, but the checkbook was consistently overdrawn.  (Tr. 37.)  Plaintiff further testified that he would experience periods of mania where he would try to do everything. (Tr. 35.)  Those cycles would occur two to three times a week or once per month.  (*Id.*) During a manic phase, he would start projects but would be unable to finish them.  (Tr. 36.)

Plaintiff testified that during his period of disability, he did part-time work on a horse farm totaling about 50 to 60 hours over a three-month period.  (Tr. 32.)  He also worked

about five hours per week doing data entry work for his sister.  (Tr. 33.)  Plaintiff stated that he volunteered at his church's Vacation Bible School program by running PowerPoint presentations and was involved with a Saturday morning group "that has helped tremendously."  (Tr. 38.)  He testified that in February 2012, his medication seemed to be working and he sought employment.  (*Id.*)  He received a temporary full-time job.  (*Id.*)  Plaintiff stated that he still experienced some difficulties but was able to handle them.  (Tr. 39.)

### 2. Vocational Expert's Hearing Testimony

Thomas Nimberger, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience, who had no exertional limitations.  (Tr. 47.) The individual would be limited to simple, routine, and repetitive tasks with no production rate or pace work; that is, no fast pace or strict production requirements, although competitive production requirements would still exist.  (*Id.*)  Furthermore, the individual would be limited to no more than occasional changes in the work setting and superficial interaction with the public and coworkers.  (*Id.*)  The VE testified that the hypothetical individual would be capable of performing such jobs as a polisher, packager, and janitor.  (Tr. 48.)

### III. STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  [20 C.F.R. § 416.905](); [*Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981)]().  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since December 2, 2008, the alleged onset date.

3.  The claimant has the following severe impairment: bipolar II disorder.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non exertional limitations: limited to simple, routine, repetitive tasks; occasional changes in the work setting; no production rate or pace work; and superficial interaction with public coworkers.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born in November 1971 and was 37-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 2, 2008, through the date of this decision.

(Tr. 12-19.)

### V.  LAW & ANALYSIS

#### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

    **B.**    **Plaintiff's Assignment of Error**

        **1.**    **The ALJ Erred in Evaluating the Opinions of Plaintiff's Treating Physicians.**

Plaintiff argues that the ALJ erred in evaluating the opinions of Plaintiff's treating psychiatrist, Dr. Castro, and treating psychologist, Dr. Hellwig. "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent

11

with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004)* (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson,* 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id*.

### a.   Dr. Hellwig

Plaintiff argues that the ALJ violated the treating physician rule by failing to give controlling weight to the January 2011 and August 2012 opinions of Dr. Hellwig.  In January 2011, Dr. Hellwig noted that Plaintiff's judgment and concentration were diminished and he had difficulty with follow-through when depressed/distracted.  (Tr. 272.)   In August 2012, Dr. Hellwig opined that from October 2010 until approximately January 2012, Plaintiff struggled significantly and would not have been a reliable employee, and he experienced symptoms severe enough to interfere with the attention and concentration necessary to perform simple tasks.  (Tr. 238.)  In assessing Dr. Hellwig's opinions, the ALJ wrote:

> Little weight is accorded to the opinions of Dr. Hellwig in Exhibits 9F and 11F.  In Exhibit 11F, Dr. Hellwig did not opine more than moderate limitation. In Exhibit 9F, although Dr. Hellwig opined the

> claimant limited during the requested closed period, she did not opine a specific degree of functional limitation, and she concluded the claimant retained the ability to work. I find that the record as a whole supports that the claimant has some limitation, but not to the level he alleges.

(Tr. 18.)

According to Plaintiff, the ALJ's stated reasons for rejecting Dr. Hellwig's opinions were insufficient. The Court disagrees. The ALJ did not err in declining to assign controlling weight to Dr. Hellwig's opinions, because he gave good reasons for doing so and substantial evidence supports that conclusion. The ALJ acknowledged that Dr. Hellwig was a treating source who saw Plaintiff on several occasions, but nonetheless concluded that her opinions of Plaintiff's mental limitations were not supported by the record. (*Id.*) If this were all the ALJ had said about the evidence, the case could require remand.[3]

In this case, however, the ALJ's opinion, taken as a whole, thoroughly evaluates the evidence and indicates the weight the ALJ gave it. This provides a sufficient basis for the ALJ's rejection of Dr. Hellwig's opinions, *see Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-71 (6th Cir. 2006), and affords this Court the opportunity to meaningfully review the ALJ's opinion. In *Nelson,* the ALJ failed to discuss the opinions of two of the plaintiff's treating physicians, and the plaintiff argued that this failure constituted a basis for remand.

---

[3] There is case law supporting the general proposition that an ALJ's broad statement rejecting a treating physician's opinion without giving specific reasons for rejecting it requires remand. See *Wilson,* 378 F.3d at 545 (finding that the ALJ's "summary dismissal" of the opinion of the claimant's treating physician failed to satisfy the "good reasons" requirement); *Friend v. Comm'r of Soc. Sec.,* 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss the treating physician's opinion as incompatible with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

13

The Sixth Circuit disagreed, concluding that "the ALJ's evaluation of [the plaintiff's] mental impairments indirectly attacks both the supportability of [the treating physicians'] opinions and the consistency of those opinions with the rest of the record evidence." 195 F. App'x at 470. Because the ALJ's discussion of the other evidence "implicitly provided sufficient reasons for not giving . . . controlling weight" to the treating physicians, the Sixth Circuit concluded that the ALJ's decision satisfied the purposes of the controlling physician rule. *Id.* at 472.

In this case, the ALJ provided a discussion of the evidence before evaluating the opinions of Dr. Hellwig. (Tr. 15-18.) For example, the ALJ discussed the following evidence, which implicitly rejects Dr. Hellwig's opinions regarding Plaintiff's mental limitations:

- Plaintiff had mild restriction in activities of daily living. (Tr. 13.) Plaintiff testified that he provides care for his daughter and for the family pets; he completes light household chores including taking out the trash and mowing the lawn; he walks, rides with others, or drives to shop for food and necessities; and he reported the hobbies of reading and playing sports, although he does not play sports regularly anymore. (*Id.*)

- Plaintiff had moderate difficulties in social functioning. (Tr. 13.) He did church work consisting of helping with Bible school by running PowerPoint presentations, and regularly attended church on Sundays. (*Id.*) He did not report any problems getting along with family, friends, neighbors, or others, and did not appear to have trouble communicating during his hearing. (Tr. 13-14.)

- Plaintiff had moderate difficulties with regard to concentration, persistence, or pace. (Tr. 14.) He had difficulty handling finances and completing tasks, but reported that he had good ability to follow spoken instructions. (*Id.*) The ALJ observed that Plaintiff had no difficulty focusing on questions, responding appropriately, or formulating responses during his hour-long hearing. (*Id.*)

- The ALJ noted that after October 1, 2010, the record revealed improvement in Plaintiff's condition with medication. (Tr. 16.) In January 2010, Plaintiff complained of feeling distracted, but records from Dr. Hellwig revealed progress, particularly in judgment. (*Id.*) This improvement continued from February 2010 until April 2010 when Plaintiff reported difficulty sleeping and poor mood. (*Id.*) Plaintiff's symptoms improved again in June 2010 with medicine adjustment, and

14

Dr. Hellwig reported that Plaintiff's mood was more stable. (*Id.*)

- In December 2010, Dr. Hellwig indicated that Plaintiff had a variable mood with diminished judgment, but appropriate affect, full orientation, and denial of hallucinations and delusions. (Tr. 16.) The ALJ noted that Dr. Hellwig "described the claimant's cognitive status as including moderately impaired memory, normal clarity of thought, and good frustration tolerance." (*Id.*) While Plaintiff reported poor money handling skills, Dr. Hellwig noted no restriction of activities of daily living. (*Id.*) She also reported no evident limitation of social interactions, and reported that while Plaintiff experienced unpredictable episodes of depression, he was never totally incapacitated by his symptoms. (*Id.*)

- Dr. Hellwig reported in January 2011 that Plaintiff did well with routine stressors and that he was compliant with medications and appointments. (Tr. 16, 273.)

Had the ALJ discussed the aforementioned evidence immediately after stating that he was rejecting Dr. Hellwig's opinions, there would be no question that the ALJ provided "good reasons" for giving Dr. Hellwig's opinions less than controlling weight. The fact that the ALJ did not analyze the medical evidence for a second time (or refer to his previous analysis) when rejecting Dr. Hellwig's opinions does not necessitate remand of Plaintiff's case. "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)). *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766, n.6 (1969)). Accordingly, Plaintiff's argument that the ALJ violated the treating physician rule as to Dr. Hellwig is without merit.

      **b.**     **Dr. Castro**

15

Plaintiff argues that the ALJ violated the treating physician rule as to Dr. Castro, because the ALJ did not state what, if any, weight he gave to Dr. Castro's opinions regarding Plaintiff's mental condition.  In January 2011, Dr. Castro opined that Plaintiff may be most productive when allowed to complete tasks at his own pace; that he might have difficulty sustaining attention to tasks for more than four hours at a time; and that due to problems with interpersonal skills, it would probably be best if Plaintiff worked alone.  (Tr. 301.)  In April 2011, Dr. Castro opined that due to mood swings, Plaintiff's attention to tasks and productivity were unpredictable, and that Plaintiff would have a hard time dealing with others.  (Tr. 305.)  In assessing Dr. Castro's opinions, the ALJ wrote:

> Dr. Castro's opinion is inconsistent with the normal results of the mental status evaluation, which he reported.  Additionally, the global assessment of functioning score indicates the claimant's functional limitations are only borderline mild-to-moderate.  The medical evidence submitted after the hearing includes an opinion of Dr. Castro in April 2011, which states that the claimant's attention to tasks and productively [sic] are unpredictable due to mood swings (14F).  I find the opinion unsupported by Dr. Castro's treatment notes for the reasons stated above.

(Tr. 18.)  While the ALJ did not explicitly state the weight he afforded to Dr. Castro's opinions, it is sufficiently clear from his discussion of those opinions that the ALJ did not assign them controlling weight, and that he did not rely on them in determining Plaintiff's RFC.  The ALJ described Dr. Castro's opinions as "inconsistent" and "unsupported" by his own treatment notes, which included normal mental status evaluations.  (*Id.*)  Thus, remanding Plaintiff's case on the basis that the ALJ did not conduct a controlling weight analysis would be futile, as the ALJ was sufficiently clear in explaining the amount of deference he gave to Dr. Castro's opinions regarding Plaintiff's mental condition.

Moreover, the ALJ did not err in declining to assign controlling weight to Dr. Castro's opinions, because he gave good reasons for doing so and substantial evidence supports that conclusion.  The ALJ acknowledged Dr. Castro's opinion that Plaintiff's mood swings affected his ability to maintain attention to complete tasks and that Plaintiff would have a hard time dealing with others.  (Tr. 17, 301, 305.)  As the ALJ explained, however, Plaintiff reported that he was helping a fellow member of his church in April 2011, around the same time that Dr. Castro rendered his opinion.  (Tr. 17.)  While Plaintiff stated that he did not spend time with others, he also testified that he regularly attended church on Sundays.  (Tr. 13.)  Furthermore, the ALJ noted that Plaintiff was able to care for his daughter after school, and that he reported no problems getting along with family friends, neighbors, or others.  (Tr. 13-14.)

Additionally, the ALJ noted that Plaintiff reported an exacerbation in his symptoms in May 2011 due to bankruptcy and a legal license disciplinary hearing, but that May and June 2011 treatment notes from Dr. Castro indicated normal results on mental status evaluation, and Dr. Castro opined that Plaintiff's prognosis was good.  (Tr. 17.)  Indeed, in May 2011–a month after rendering his opinion that Plaintiff had difficulty maintaining attention and dealing with others–Dr. Castro wrote a letter supporting Plaintiff's fitness to practice law, stating: "I find no reason why he would not be able to continue to work responsibly and competently in his field."  (Tr. 224.)  The ALJ further noted that during psychiatric evaluations with Dr. Castro in March and May 2011, Plaintiff had normal thought content, normal thought processes, intact cognition, and good speech.  (Tr. 17.)  Furthermore, Plaintiff had a GAF score of 59, indicating the high range of moderate functional limitation.  (*Id.*)  The ALJ also noted that by February 2012, "Dr. Castro reported

17

normal results during mental status evaluation and a global assessment of functioning of 60, indicating the high range of moderate limitation (7F)."  (Tr. 17.)  By August 2012, Dr. Hellwig opined that Plaintiff "had good ability to sustain an 8-hour workday, 5 days a week."  (*Id.*)  The aforementioned evidence constitutes "good reasons" for the ALJ's decision to give Dr. Castro's opinions less than controlling weight.  Accordingly, the ALJ did not violate the treating physician rule as to Dr. Castro.

## VI.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

                                            s/ *Nancy A. Vecchiarelli*
                                            U.S. Magistrate Judge

Date: January 12, 2015